UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
:
JANE DOE 7015,                                          :
:
Plaintiff,                       :
:                    21 Civ. 6868 (JPC)
-v-                                :
:                    OPINION AND ORDER
:
ELEKTRA ENTERTAINMENT GROUP INC. *et al*,               :
:
Defendants.                      :
:
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Jane Doe 7015 alleges that from January 1997 to June 1999, when she was

between fifteen and eighteen years old, she was repeatedly sexually battered by Defendant James

Euringer, the leader of the band Mindless Self Indulgence ("MSI").  Based on that conduct, she

brings one claim for sexual battery against Euringer.  Dkt. 35 ("Am. Compl.") ¶¶ 76-81.  She

brings further claims for aiding and abetting sexual battery, *id.* ¶¶ 82-88, ratification of a sexual

battery, *id.* ¶¶ 89-99, and negligence, *id.* ¶¶ 100-16, against Defendant Joseph J. Galus, a producer

and manager for MSI; Defendant Elektra Entertainment Group Inc., whose record label, Elektra

Records or Elektra Entertainment ("Elektra"), was allegedly affiliated with MSI when some of

Euringer's alleged assaults occurred; Defendants Warner Communications LLC and Warner

Music Group Corp. (together with Elektra Entertainment Group Inc., the "Moving Defendants"),

which are allegedly successors-in-interest to entities that operated Elektra when some of the

alleged assaults occurred;[1] and five John Does.  Neither Euringer nor Galus has appeared in this

---

[1] As used in this Opinion and Order, "the Moving Defendants" refers as well to any of their
predecessors-in-interest during the relevant period.  *See infra* note 5.

case, and while Galus was served with the initial Complaint, Dkt. 15, the docket does not indicate that he has been served with the Amended Complaint. Now before the Court is the Moving Defendants' motion to dismiss all claims brought against them in the Amended Complaint.[2] Because the Court agrees that Plaintiff does not plausibly allege that the Moving Defendants are liable for aiding and abetting Euringer's alleged sexual battery of her, for ratifying that sexual battery, or for negligence causing that sexual battery, their motion to dismiss is granted.[3]

## I. Background

### A. Facts[4]

Euringer, a "self-proclaimed and self-promoted pedophile," Am. Compl. ¶ 34, first met Plaintiff in the fall of 1996, when she was fifteen and he was twenty-seven, *id.* ¶ 22. After

---

[2] In her Amended Complaint, Plaintiff brought a further claim for intentional infliction of emotional distress against all Defendants, Am. Compl. ¶¶ 117-23, but in her opposition she "agrees to dismiss her claim for Intentional Infliction of Emotional Distress as to [the Moving Defendants]." Dkt. 49 ("Pl. Opp.") at 2 n.2. For that reason, that claim is dismissed as to the Moving Defendants, and the Court will not analyze herein their arguments for its dismissal.

[3] In addition to arguing that the Amended Complaint does not adequately plead any of Plaintiff's three remaining claims against them, the Moving Defendants argue that those claims must be dismissed because (1) under the New York Child Victims Act, which revived otherwise time-barred civil claims for conduct constituting a sexual offense under certain provisions of New York criminal law, *see* N.Y. C.P.L.R. 214-g, Plaintiff's claims remain time-barred to the extent they arise from sexual contact with Euringer following her seventeenth birthday, and (2) the Amended Complaint does not plausibly allege (and it in fact is not the case) that Euringer was signed by Elektra before Plaintiff turned seventeen. Dkt. 47 ("Defts. Br.") at 2, 5-7. Plaintiff disagrees with each contention, arguing that the Child Victims Act revived claims arising from sexual conduct with Euringer that occurred when she was seventeen, Pl. Opp. at 8-10, and that Euringer was signed by Elektra when Plaintiff was sixteen, *id.* at 4-5, 5 n.4, 18 n.7. Because the Court concludes that the Amended Complaint would fail to state a claim against the Moving Defendants even were Plaintiff correct on both points, it need not resolve these disagreements, and it will therefore presuppose Plaintiff's positions solely for the purposes of this Opinion and Order.

[4] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint. *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"). While Plaintiff asks that the Court take judicial notice

communicating over the next several months via telephone, *id.* ¶ 23, they saw each other again on December 31, 1996, *id.* ¶ 24, and first had sexual intercourse in early 1997, while she was still fifteen, *id.* ¶ 25.  Their sexual contact continued for approximately the next two-and-a-half years, during which time Plaintiff would visit Euringer in New York City and the two would engage in intercourse "when they were alone at [Euringer's] apartment."  *Id.* ¶ 26.  During that period, "Euringer acted as and treated Plaintiff as though she was his girlfriend and the two were in a consensual relationship."  *Id.* ¶ 31.  Euringer's sexual contact with Plaintiff ceased in late 1999, when he lost interest in her following her eighteenth birthday.  *Id.* ¶ 75.

Euringer is the lead vocalist, arranger, and songwriter for MSI, a punk rock and electronic/industrial band.  *Id.* ¶ 5.  MSI's work featured pedophilic themes, depicted positively, including in its lyrics, *id.* ¶¶ 38-40, and in the artwork displayed on its albums, *id.* ¶ 37.  MSI released a demo entitled "Crappy Little Demo" in 1997.  *Id.* ¶ 39.  By early 1998 the band was enjoying "emerging popularity in underground music," and record labels were attempting to sign it.  *Id.* ¶ 53.  During the 1990s, record labels faced pressure to sign new and promising bands quickly, lest they be signed by a competitor instead.  *Id.* ¶ 52.  Consequently, labels would ordinarily first secure a commitment from a band through a verbal contract or a short written contract, called a "short form contract," at which point the label would invest in the band, promote it, and coordinate its musical activities.  *Id.*  Only later, following negotiations, would the label and the band enter into a full, written contract.  *Id.*  In early 1998, MSI was signed by Elektra via either an oral or a written short form contract.  *Id.* ¶ 56.  Subsequently, as was customary, Elektra

---

of portions of the Child Victim Act's legislative history, Dkt. 49-1 to -3, that request is denied as moot because this Opinion and Order does not interpret the Child Victims Act, *see supra* note 3. For the avoidance of doubt, the Court notes explicitly that the claims made about Euringer's sexual abuse of Plaintiff are not facts found to be true by the Court but rather allegations made by Plaintiff and merely assumed to be true for purposes of this Opinion and Order.

began to invest in MSI and to collaborate with MSI on its concerts and on the production of its musical works, including by introducing MSI to industry professionals who could work on future releases. *Id.* In addition, in 1998, the Moving Defendants helped MSI sign a distribution and promotion agreement with Alternative Distribution Alliance, a corporate affiliate that specialized in album manufacturing and distribution. *Id.* ¶ 62. Around January 1999, MSI entered into a long-form contract with one of the Moving Defendants.[5] *Id.* ¶ 64. Subsequently, Elektra continued to collaborate with MSI on the production and release of its music, *id.* ¶¶ 67-68, and on its concerts, *id.* ¶ 69. Elektra's relationship with MSI continued through about 2002. *Id.* ¶ 75.

Euringer's sexual contact with Plaintiff, which continued through 1999, overlapped with the period when MSI was signed to Elektra, which began in 1998. During that period, Plaintiff was "treated . . . as a VIP with [MSI] band members, and she received all-access, backstage, and V.I.P. passes to several artists' concerts." *Id.* ¶ 58. Along with Elektra personnel, she was present in the recording studio during the production process for MSI's album, "Tight," which was mixed and mastered in the summer of 1998 and was released in 1999. *Id.* ¶ 60. Furthermore, the sexual

---

[5] The history of Elektra's corporate structure is somewhat complex. Elektra, the record label, was founded around 1950. Am. Compl. ¶ 13. Around 1970, it was acquired by Warner Communications, Inc. ("Warner, Inc."), *id.*, an alleged predecessor-in-interest of Defendant Warner Communications LLC, *id.* ¶ 8. Since then, Elektra has been affiliated in various ways with Warner, Inc. or its successors-in-interest. Between approximately 1989 and 1998, Elektra was operated as a division of Warner, Inc., not as a standalone corporate entity. *Id.* ¶ 14. Plaintiff alleges that MSI was signed as an artist on the Elektra record label when Elektra was operated as a division of Warner, Inc., but that it is unclear which Defendant is the successor-in-interest to that division of Warner, Inc. *Id.* ¶ 17 (defining "Warner Defendant" as the entity that is a successor-in-interest to the division of Warner Communications, Inc. that operated the Elektra label in 1998); *id.* ¶ 56 (alleging that "Warner Defendant" signed MSI in early 1998). In November 1998, a new corporate entity was founded, Defendant Elektra Entertainment Group Inc., which subsequently operated the Elektra record label, *id.* ¶ 15, and was itself an asset of Warner, Inc., *id.* ¶ 16. In 2003, Defendant Warner Music Group Corp. was incorporated and acquired Warner, Inc.'s music business, including the Elektra label. *Id.* Nonetheless, because the Court finds that the Amended Complaint fails to adequately plead any of the claims it brings against the Moving Defendants, Elektra's corporate structure does not affect the legal analysis in this Opinion and Order.

nature of the relationship between Plaintiff and Euringer was "known to all and an open secret." *Id.* ¶ 57.  In front of others, including employees and agents of the Moving Defendants, Euringer would kiss and hug Plaintiff in "a non-platonic fashion," *id.* ¶ 57, and on one occasion Plaintiff introduced herself as Euringer's "girlfriend," *id.* ¶ 58.  Plaintiff "looked far younger than her actual years and resembled a pre-pubescent child," *id.* ¶ 30, and on such occasions, her "age was frequently the source of amusement and ribbing, especially given her inability to legally drink onsite at concerts, bars, and/or other industry events," *id.* ¶ 57.  In addition, before and during MSI's association with Elektra, sexual themes, particularly relating to underage girls, were prominent both on its albums and musical productions, *id.* ¶¶ 37-40, 49, 63, 67, and in its stage persona, *id.* ¶¶ 59, 69-70.  Indeed, Euringer's sexual abuse of Plaintiff herself was his inspiration in writing multiple songs with pedophilic themes that were included on MSI albums released by Elektra, *id.* ¶¶ 41, 67, and, with her permission, the band produced promotional t-shirts bearing a photograph of Plaintiff taken when she was approximately fifteen, *id.* ¶ 66.  At least in part due to this conduct, at least two other record labels had reservations about signing MSI during the period before it was signed by Elektra.  *Id.* ¶ 54.

## B.    Procedural History

On August 9, 2021, Plaintiff filed a summons and complaint in the Supreme Court of the State of New York, County of New York, bringing claims against Defendants for sexual battery, aiding and abetting sexual battery, negligence, and intentional infliction of emotional distress.  Dkt. 1-1.  Defendants Elektra Entertainment Group Inc. and Warner Music Group Corp.[6] removed that action to this Court on August 15, 2021, Dkt. 1, where it was assigned to the Honorable Edgardo

---

[6] On November 22, 2021, counsel for those two Defendants noticed an appearance on behalf of the third Moving Defendant, Warner Communications LLC.  Dkt. 12.

Ramos, *see* Case Opening Initial Assignment Notice dated Aug. 16, 2021.  On January 28, 2022, the case was reassigned to the Honorable Alison J. Nathan.  *See* Notice of Case Reassignment dated Jan. 28, 2022.  On February 14, 2022, the Moving Defendants filed a motion to dismiss.  Dkt. 28.  Plaintiff then filed the Amended Complaint on March 7, 2022, which added a fifth claim for ratifying a sexual battery and additionally modified various of Plaintiff's factual allegations.  *Compare* Dkt. 1-1 *with* Am. Compl.[7]  The Moving Defendants moved to dismiss the claims against them in the Amended Complaint on April 4, 2022.  Dkt. 46.  On April 10, 2022, this case was transferred to the undersigned.  *See* Notice of Case Reassignment dated Apr. 10, 2022.  On April 18, 2022, Plaintiff opposed the Moving Defendants' motion to dismiss, Dkt. 49, and on April 25, 2022, the Moving Defendants replied, Dkt. 54.

## II.  Discussion

The Court will separately consider each of the three remaining causes of action pled against the Moving Defendants:  aiding and abetting sexual battery, Am. Compl. ¶¶ 82-88, ratification of sexual battery, *id.* ¶¶ 89-99, and negligence, *id.* ¶¶ 100-16.  In each case, the Court concludes that the Amended Complaint fails to adequately plead at least one element required by New York law.[8]

### A.     Aiding and Abetting Sexual Battery

Under New York law, the elements of a claim for aiding and abetting another tort are "(1) the existence of an underlying tort; (2) the defendant's knowledge of the underlying tort; and (3) that the defendant provided substantial assistance to advance the underlying tort's commission."

---

[7] In light of the filing of the Amended Complaint, the Court dismissed the Moving Defendants' original motion to dismiss as moot.  Dkt. 56.

[8] The Amended Complaint alleges that Euringer's sexual abuse of Plaintiff occurred in New York, Am. Compl. ¶¶ 5, 26, and the parties each presume that New York law applies to Plaintiff's claims, *see generally* Defts. Br. at 7-22; Pl. Opp. at 13-22.  The Court will therefore apply New York law to evaluate Plaintiff's claims.

*Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012) (internal quotation marks and brackets omitted). The Moving Defendants argue that, for two reasons, the allegations pled in the Amended Complaint do not give rise to an inference that any Moving Defendant satisfies the third element of aiding and abetting: Plaintiff does not plausibly allege, first, that they substantially assisted in committing the sexual battery, and second, that they knew or intended that their conduct would substantially assist in the battery. Defts. Br. at 8-10. On each count, the Court agrees.

To be liable for aiding and abetting an assault and battery, "a defendant must have committed some overt act, either by words or conduct, in furtherance of the" tort. *McKiernan v. Vaccaro*, 91 N.Y.S.3d 478, 481 (App. Div. 2019). Crucially, this rule requires the overt act in question to further the underlying tort itself—in this case, Euringer's alleged sexual battery of Plaintiff. *See also Bigio*, 675 F.3d at 173 (interpreting New York law to "require that the defendant's conduct bear some contributory relation to the primary tort"); *Oakley v. MSG Networks*, No. 17 Civ. 6903 (RJS), 2021 WL 5180229, at *8 n.3 (S.D.N.Y. Nov. 8, 2021) ("An aiding-and-abetting claim requires demonstrating that a defendant knowingly and substantially assisted in a wrongful act . . . ."); *Naughright v. Weiss*, 826 F. Supp. 2d 676, 691 (S.D.N.Y. 2011) (interpreting the "cause of action for aiding and abetting an assault and battery" to require "the defendant's knowing and substantial assistance in the principal violation"); *Scollo v. Nunez*, 874 N.Y.S.2d 380, at *2 (App. Div. 2009) (affirming a denial of summary judgment on the grounds that "there exist triable issues of fact as to whether the appellants knowingly provided substantial assistance in furtherance of the alleged battery"). And while the Amended Complaint does plausibly allege that the Moving Defendants substantially assisted Euringer in his musical career, and even perhaps that they substantially assisted him in taking Plaintiff to concerts, recording sessions, and other musical events, Pl. Opp. at 15, those allegations on their own do not plausibly

support the inference that they substantially assisted his sexual battery of Plaintiff.[9]   Indeed, Plaintiff's own brief opposing dismissal argues only that the Amended Complaint "sufficiently alleges Defendants knowingly gave substantial assistance to the perpetrator" in general, *id.*, not that they assisted him in perpetrating the tort that they allegedly aided and abetted.

Plaintiff instead argues that a defendant may "substantially assist" in a primary tort merely by providing encouragement to the primary violator.  *Id.*; *see Pittman ex rel. Pittman v. Grayson*, 149 F.3d 111, 123 (2d Cir. 1998).  But as with other forms of substantial assistance, that encouragement must likewise be directed at the tort itself to render a defendant liable for aiding and abetting it.  *See Shea v. Cornell Univ.*, 596 N.Y.S.2d 502, 503-04 (App. Div. 1993) ("[A]bsent overt encouragement *of the offensive behavior*, merely . . . giving tacit approval cannot be deemed aiding or abetting the assault." (emphasis added)).  And while Plaintiff argues that the Moving Defendants "encouraged Euringer's criminal misconduct with Plaintiff by actively elevating Euringer's stardom and fame to profit from his pedophilic branding and behavior, procuring a distribution deal to widely market his unmistakably pedophilic songs, [and] fully embracing and promoting his music persona that was uniquely tied to pedophilia," Pl. Opp. at 15, these allegations support only the inference that the Moving Defendants overtly encouraged Euringer's musical career, not that they encouraged his sexual battery of Plaintiff.

Second, in addition to requiring that a defendant substantially assist in the commission of the primary tort, New York law further requires the defendant to know or intend that his conduct will substantially assist in its commission in order to be liable for aiding and abetting it.  *Oakley*,

---

[9] Furthermore, the theory that the Moving Defendants substantially assisted Euringer by failing to prevent his sexual battery of Plaintiff or "turning a blind eye" to it, Pl. Opp. at 15, is foreclosed by New York's requirement that "a defendant must have committed some *overt act*," *McKiernan*, 91 N.Y.S.3d at 481 (emphasis added), to be liable for aiding and abetting assault and battery.

2021 WL 5180229, at *8 n.3 ("An aiding-and-abetting claim requires demonstrating that a defendant knowingly and substantially assisted in a wrongful act . . . ."); *Naughright*, 826 F. Supp. 2d at 691 (requiring "the defendant's knowing and substantial assistance in the principal violation"); *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) ("[T]he Trustee must show that the defendants knowingly aided the insiders in converting the customers' funds . . . ."); *IDX Cap., LLC v. Phoenix Partners Grp.*, 922 N.Y.S.2d 304, 307 (App. Div. 2011), *aff'd*, 970 N.E.2d 864 (N.Y. 2012) (dismissing a claim for aiding and abetting when the plaintiff's allegations were "clearly insufficient to draw an inference that [the defendants] took 'common action for a common purpose by common agreement or understanding . . . from which common responsibility derives'" (ellipsis in original) (quoting *Goldstein v. Siegel*, 244 N.Y.S.2d 378, 382 (App. Div. 1963))); *Scollo*, 874 N.Y.S.2d 380, at *2 (framing the dispositive question as "whether the appellants knowingly provided substantial assistance in furtherance of the alleged battery"); *Nat. Westminster Bank USA v. Weksel*, 511 N.Y.S.2d 626, 630 (App. Div. 1987) (explaining that allegations in support of a claim for aiding and abetting must show what the defendant "can be said to have done with the intention of advancing the [tort's] commission").[10]   And even were the

---

[10] Plaintiff contends that New York law does not in fact impose this requirement, instead imposing liability for aiding and abetting on a defendant "who knew of the wrongful nature of the tortious actions," Pl. Opp. at 13 (internal quotation marks omitted), regardless of whether the defendant further knew of the role its assistance played in furthering those actions.  In particular, she argues that cases imposing the latter requirement improperly rely on a decision applying D.C. law, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), and that the Second Circuit rejected that approach in *Pittman*, 149 F.3d at 122-23.  Pl. Opp. at 14.  Both aspects of this argument are mistaken.  First, while *Halberstam* did hold that an aider and abettor must "knowingly and substantially assist the principal violation," 705 F.2d at 477, that analysis rested on general common law principles rather than distinctive principles of D.C. law, *see generally* 705 F.2d at 476-86 (citing Prosser on Torts, the Restatement (Second) of Torts, West's American Jurisprudence, and cases arising under federal law and the law of multiple different states).  New York law certainly could depart from these general principles, but such a departure cannot be shown simply by the fact that they also form part of D.C. law.

allegations in the Amended Complaint sufficient to justify the inference that the Moving Defendants substantially assisted in Euringer's sexual battery of Plaintiff, which they are not, nothing in the Amended Complaint suggests that the Moving Defendants possessed the knowledge or intention that their conduct would assist him in committing that crime.

Thus, because Plaintiff has not adequately alleged either that the Moving Defendants substantially assisted in Euringer's alleged sexual battery through some overt act or that they knew or intended that their conduct would do so, she has not pled a claim against them for aiding and abetting the crime.

## B.    Ratifying Sexual Battery

Both New York courts and the Second Circuit ordinarily analyze ratification under New York law by relying on general principles of the common law of agency, including those set forth in the Restatement (Second) of Agency.  *Hamm v. United States*, 483 F.3d 135, 140 (2d Cir. 2007) (quoting the Restatement); *Standard Funding Corp. v. Lewitt*, 678 N.E.2d 874, 877 (N.Y. 1997)

---

Second, *Pittman* did not hold that no such requirement exists under New York law.  To be sure, on the facts of that case—in which the defendant airline transported two children and their mother to her home country despite court orders forbidding the children's departure—the only conceivable dispute to as knowledge concerned whether the airline knew that the mother's removal of the children from the United States was wrongful, not whether it knew that permitting them to board and take the flight would substantially assist in their departure from the country.  Thus, the Second Circuit's analysis centered on the former, not the latter.  Nonetheless, it held that aiding and abetting is a "variet[y] of concerted-action liability" and that such liability, in general, "is based on the principle that all those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer are equally liable with him."  *Pittman*, 149 F.3d at 122 (internal quotation marks, brackets, and ellipsis omitted); *accord Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222, 224 (N.Y. 1992) ("The theory of concerted action provides for joint and several liability on the part of all defendants having an understanding, express or tacit, to participate in a common plan or design to commit a tortious act." (internal quotation marks omitted)).  And since a plan or design is not "common" to its participants unless all know of it, *Pittman* confirms that under New York law an aider and abettor must both know of the underlying tortious conduct itself and know of or intend to perform his own role in the common plan or design to commit that tort.

(same); *Holm v. C.M.P. Sheet Metal*, 455 N.Y.S.2d 429, 432 (App. Div. 1982) (citing the Restatement and the treatise New York Jurisprudence); *J.M. Heinike Assocs., Inc. v. Chili Lumber Co.*, 443 N.Y.S.2d 512, 513 (App. Div. 1981) (citing the Restatement); *Connors-Haas, Inc. v. Bd. of Educ.*, 397 N.Y.S.2d 269, 271 (App. Div. 1977) (same), *rev'd on other grounds*, 378 N.E.2d 1043 (N.Y. 1978).  In relevant part, the Restatement provides that "[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."  Restatement (Second) of Agency § 82; *accord Hamm*, 483 F.3d 135 (quoting that rule). Under this rule, which both parties urge the Court to employ, *see* Defts. Br. at 10-11; Pl. Opp. at 16, the prior act allegedly ratified—here the sexual battery of Plaintiff—must have been "done or professedly done on [the Moving Defendants'] account."  In other words, "Purporting to Act as Agent [is] a Requisite for Ratification."  Restatement (Second) of Agency § 85.  Consequently, an act "is subject to ratification if, but only if, the one doing the act intends or purports to perform it as the servant of another."  *Id.* § 85(2); *accord* 57 N.Y. Jurisprudence: Estoppel, Ratification, and Waiver § 95 (2d ed. 2023) (providing that an act may be ratified by "the person in whose name [the] act was performed").  The Amended Complaint is devoid of allegations, however, that when Euringer committed sexual battery upon Plaintiff, he either purported or intended to perform those sexual acts as the agent of any Moving Defendant.  Indeed, given the allegation that Euringer was a "self-proclaimed and self-promoted pedophile," Am. Compl. ¶ 34, it would seem clear that he engaged in sexual activity with Plaintiff very much on his own account.  For that reason, the Amended Complaint fails to adequately plead a claim for ratification of sexual battery.

Appealing to *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303 (S.D.N.Y. 2006), Plaintiff argues that the Amended Complaint is adequately pled because to satisfy this element of

ratification, a plaintiff need establish "only that a person's conduct generates the belief to a third-party that they are acting on behalf of someone else."  Pl. Opp. at 17 (citing *Dover*, 423 F. Supp. 2d at 318).  Plaintiff, however, has conflated ratification with apparent authority, which are distinct doctrines of agency law.  As explained in *Dover*, "[t]he doctrine of apparent authority . . . requires a 'factual showing that a third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal . . . .'" 423 F. Supp. 2d at 318 (brackets and emphasis omitted) (quoting *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993 (2d Cir. 1991)).  But because Plaintiff does not claim that the Moving Defendants are liable based on Euringer's apparent authority, her arguments as to what beliefs were generated by the Moving Defendants' promotion of MSI's music, given its allegedly pedophilic themes, are beside the point.  Indeed, when *Dover* turns from apparent authority to ratification, it endorses the doctrine set forth in the Restatement, explaining that "a person may be liable as a principal if he affirms or ratifies an act done by one *who purports to be acting for the ratifier*."  *Id*. (internal quotation marks omitted) (emphasis added).  Thus, because the Amended Complaint does not allege that Euringer himself intended or purported to act for the Moving Defendants when he engaged in sexual contact with Plaintiff, it has not adequately pled that the Moving Defendants ratified his sexual battery.

## C.    Negligence

"The elements of a negligence claim under New York law are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach."  *Pasternack v. Lab'y Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015) (internal quotation marks omitted).  Although the Amended Complaint did not clearly specify its theory of what duty owed to Plaintiff the Moving Defendants breached, her opposition offers two possible theories:  (1) a duty to non-negligently select, instruct, and supervise Euringer, their independent

contractor, Pl. Opp. at 18-21, or (2) a duty to protect Plaintiff, which duty they assumed through their conduct, *id.* at 21-22.  The Court will thus separately analyze whether the allegations in the Amended Complaint are adequate to state a claim under either theory.

### 1.    Negligent Selection, Instruction, or Supervision

Under the doctrine of *respondeat superior*, an employer is generally liable for torts that its employees commit within the scope of their employment.  *E.g.*, *Kelly v. Starr*, 120 N.Y.S.3d 373, 375 (App. Div. 2020) ("The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment . . . .").  When either of those two conditions is not met—that is, when injury is caused by an independent contractor or by an employee acting outside the scope of employment—the employer ordinarily is not vicariously liable and, outside certain exceptions, can be liable only for its own negligence in selecting, instructing, or supervising the primary tortfeasor.  *Kleeman v. Rheingold*, 614 N.E.2d 712, 715 (N.Y. 1993) (independent contractor); *D'Amico v. Christie*, 518 N.E.2d 896, 901-02 (N.Y. 1987) (employee acting outside the scope of employment).[11]  Plaintiff does not (and could not plausibly) allege that when Euringer committed sexual battery, he was an employee of the Moving Defendants acting within the scope of his employment.  Thus, she argues instead that they are liable for negligently selecting, instructing, or supervising him.  Pl. Opp. at 18-19.

Under this theory, an employer does not have a boundless duty to prevent its employees or independent contractors from committing any tort in any way whatsoever.  Instead, employers have only a limited duty to prevent their employees or the independent contractors they retain from

---

[11]  Because New York courts do not appear to analyze the tort of negligent selection, instruction, or supervision differently depending on whether the primary tortfeasor was an employee acting outside the scope of his employment or an independent contractor, the Court's analysis of Plaintiff's claims relies upon cases arising under both fact patterns.

performing certain torts.  Thus, the Moving Defendants argue, "a negligent hiring or supervision claim fails where, as here, the primary function of the business was unrelated to the harm-causing event, or where the employer lacked direct control or supervision over the action."  Defts. Reply at 9.  Because the Court agrees that the sexual battery allegedly committed by Euringer fell outside of the scope of any duty the Moving Defendants may have had to select, instruct, and supervise the musicians they hired as independent contractors, it concludes that Plaintiff has not stated a claim for negligence against the Moving Defendants based on a theory of negligent selection, instruction, or supervision.

A plaintiff may recover for a defendant's negligence in selecting, instructing, or supervising an employee or independent contractor who commits a sexual battery only by establishing a "nexus between the alleged attacker's *employment* and the sexual assault."  *Roe v. Domestic & Foreign Missionary Soc'y of the Protestant Episcopal Church*, 155 N.Y.S.3d 418, 421 (App. Div. 2021); *accord Gonzalez v. City of New York*, 17 N.Y.S.3d 12, 17 (App. Div. 2015) ("[W]hat the plaintiff must demonstrate is a connection or nexus between the plaintiff's injuries and the defendant's malfeasance.").  As a result, "the theory that a principal has negligently supervised or instructed an independent contractor normally entails supervision or instruction as to the performance of the principal's work."  *Sandra M. v. St. Luke's Roosevelt Hosp. Ctr.*, 823 N.Y.S.2d 463, 468 (App. Div. 2006).  A principal's duty is to adequately instruct and supervise its independent contractor when he is performing work under the principal's direction, not in every facet of his life.  Similarly, the principal's duty in hiring is not to select independent contractors who avoid tortious conduct in every facet of their lives but rather to select independent contractors who are not "incompetent or otherwise unsuitable" and are instead "properly qualified to undertake the work" for which they were hired.  *Maristany v. Patient Supports Servs., Inc.*, 693 N.Y.S.2d

143, 145 (App. Div. 1999).  On this approach, "[t]he principal may be negligent because he has reason to know that the servant or other agent . . . is likely to harm others *in view of the work or instrumentalities entrusted to him*."  Restatement (Second) of Agency § 213 cmt. d (emphasis added).  The principal's liability is grounded in the "undue risk of harm [that] would exist *because of the employment*" of the employee or independent contractor.  *Id.* (emphasis added).  Since negligent selection, instruction, or supervision can trigger liability for conduct beyond the reach of *respondeat superior*, a plaintiff need not allege that the torts of an employee or independent contractor occurred within the scope of employment, which turns on whether the tortious act itself was undertaken to further the employer's interest or instead for the employee's personal reasons.  *See, e.g.*, *Pinto v. Tenenbaum*, 963 N.Y.S.2d 699, 701 (App. Div. 2013).  But a plaintiff must show that the defendant's "negligence lies in his having placed the employee [or independent contractor] in a position to cause foreseeable harm," *Detone v. Bullit Courier Serv., Inc.*, 528 N.Y.S.2d 575, 576 (App. Div. 1988), either through his initial selection to perform a particular task or through the instruction or supervision of his performance of it.

Because those hired as independent contractors or as employees are ordinarily granted access to the employer's property in their capacity as contractors or employees, the most traditional and straightforward way for the requisite nexus to exist is when the employee or independent contractor "causes harm—however disconnected from work purposes—using an item provided by the" defendant or when the defendant "fails to prevent foreseeable harm in the workplace." *Waterbury v. N.Y.C. Ballet, Inc.*, 168 N.Y.S.3d 417, 424-25 (App. Div. 2022).  The allegations in the Amended Complaint, however, are plainly inadequate to establish the existence of a nexus through either of these two approaches.  Plaintiff alleges that Euringer committed sexual battery in his apartment, not in the workplace.  *E.g.*, Am. Compl. ¶ 26.  There is no allegation that any

battery occurred at the Moving Defendants' premises, or even any allegation of conduct with Plaintiff occurring at their premises.[12]   Nor is there any allegation that Plaintiff somehow had an independent relationship with the Moving Defendants.   And while Plaintiff argues in her briefing that "Euringer used Defendants' chattels when he assaulted Plaintiff then used his abuse to write songs that belonged to and were released by Defendants," Pl. Opp. at 21 n.9, this argument could establish only that Euringer used his tortious conduct to write songs, whereas Plaintiff must establish the converse—namely, that he used the songs to engage in tortious conduct.   *See Waterbury*, 168 N.Y.S.3d at 424; *cf. Gonzalez*, 17 N.Y.S.3d at 17 (finding negligent selection, instruction, and supervision adequately pled when a municipal employer allowed a police officer "to retain his [city-issued] weapon and ammunition after it allegedly learned of his dangerous propensities"); *Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 446 (App. Div. 2011) ("[The primary tortfeasor] used defendant's computers, material and personnel to harass and intimidate [the plaintiffs] . . . .").   Thus, Plaintiff cannot rely on Euringer's access to the Moving Defendants' property to establish the requisite nexus between his being an independent contractor and his sexual battery of her.

Nor are the allegations in the Amended Complaint sufficient to establish that nexus on some other basis.   As mentioned, a defendant's liability for negligent selection, instruction, or supervision "lies in his having placed the employee [or independent contractor] in a position to cause foreseeable harm."   *Detone*, 528 N.Y.S.2d at 576.   Thus, a plaintiff must plausibly allege that the defendant put the primary tortfeasor in a position to cause the plaintiff's injury either by

---

[12] Plaintiff alleges that Euringer would bring her to concerts where Euringer encouraged her to drink alcohol, despite her being a minor, and he would refer to her as his girlfriend, Am. Compl. ¶¶ 30, 58, but she does not allege that these concerts were on the Moving Defendants' premises or even that any battery occurred on these occasions.

initially selecting him to perform a particular task as an independent contractor or by instructing or supervising him in performing that task.  But the allegations in the Amended Complaint do not support a plausible inference that the Moving Defendants placed Euringer in a position to commit sexual battery on Plaintiff.  The Amended Complaint alleges that the Moving Defendants hired Euringer as a musician and supervised and assisted him in various aspects of his musical career.  Am. Compl. ¶¶ 56, 60, 62-63, 67-68, 71.  But it contains no further allegations to plausibly justify the inference that merely signing Euringer as a musician on the Elektra label somehow enabled him to commit sexual battery on Plaintiff.  Indeed, since the Amended Complaint alleges that Euringer's sexual contact with Plaintiff began approximately a year before he was signed by Elektra, *id.* ¶ 25, it makes clear that he was in a position to commit his tortious conduct well before he became the Moving Defendants' independent contractor, and thus that their selecting him for that role did not place him in the position to cause the injury she alleges she suffered.  *See Detone*, 528 N.Y.S.2d at 576.  Similarly, no allegations in the Amended Complaint plausibly justify the inference that the Moving Defendants' instruction and supervision placed Euringer in a position to commit sexual battery on Plaintiff:  she does not identify any specific instructions or supervision that plausibly had any causal influence on his sexual contact with her, and, again, the alleged year-long period of regular sexual contact between the two before he was signed by Elektra makes clear that he was in a position to commit sexual battery independent any supervision or instruction that they provided.  Given that Euringer's sexual battery of Plaintiff occurred off the Moving Defendants' property, that her connection with him began prior to his being signed, and that she had no independent relationship with them, "there is simply no nexus between the alleged attacker's *employment* and the sexual assault."  *Domestic & Foreign Missionary Soc'y of the Protestant Episcopal Church*, 155 N.Y.S.3d at 421.

Plaintiff's suggestion that Defendants "failed to supervise or instruct Euringer in the course of their relationship" Pl. Opp. at 20, might instead suggest that the requisite nexus existed not between her sexual battery and the Moving Defendants' negligence in selecting, instructing, or supervising Euringer with respect to his musical career, but rather between the battery and their negligence in selecting, instructing, or supervising him with respect to his conduct towards her. But even were it plausibly alleged that by forbidding Euringer from continuing his sexual contact with Plaintiff, the Moving Defendants could have prevented some of the torts inflicted upon her, merely signing an independent contractor does not impose a duty to supervise aspects of that contractor's personal life that are wholly separate from the contractual relationship. The Moving Defendants signed Euringer to the Elektra label as a musician who would record and perform music for them; they were not in the business of facilitating interpersonal relationships, and the Amended Complaint of course does not allege that the Moving Defendants selected him as an independent contractor to engage in sexual relations with anyone, much less with Plaintiff. Furthermore, the Amended Complaint does not allege that the Moving Defendants instructed or supervised Euringer in his interactions with Plaintiff. New York courts routinely dismiss claims for negligent selection, instruction, or supervision alleging that an independent contractor engaged in tortious conduct while not under the supervision, control, or instructions of the defendant. *See, e.g.*, *Sandra M.*, 823 N.Y.S.2d at 468 ("[T]he theory that a principal has negligently supervised or instructed an independent contractor normally entails supervision or instruction as to the performance of the principal's work . . . ."); *Saini v. Tonju Assocs.*, 750 N.Y.S.2d 55, 57 (App. Div. 2002) ("[The contractor's] personnel exclusively installed and maintained the temporary steam system and there is no evidence that [the defendant] performed any work on it at all. . . . [T]he mere presence of [the defendant's] personnel on the premises is not, in our view, sufficient

to raise an issue of fact as to whether they supervised or controlled [the contractor's] work . . . ."); *Finnegan v. Pepsi-Cola Bottling Co. of N.Y., Inc.*, 656 N.Y.S.2d 644, 644 (App. Div. 1997) (dismissing a claim for negligently instructing or supervising an independent contractor that improperly constructed a supermarket display because "there is no evidence in admissible form that the display was constructed in accordance with the appellant's instructions, nor that the materials provided contributed to the accident"). Thus, because in hiring Euringer as an independent contractor the Moving Defendants did not select, instruct, or supervise him with respect to his interactions with Plaintiff, any negligence in their failure to do so cannot establish a nexus between her injuries and his employment. And because Plaintiff has not adequately pled that such a nexus exists, on any theory, she has not stated a claim for negligent selection, supervision, or instruction.

### 2.     Assumption of Duty

Next, Plaintiff argues that even if the law would not otherwise impose a duty on the Moving Defendants, they may nonetheless be liable if through their conduct they assumed a duty that they subsequently breached. Pl. Opp. at 21-22. As Plaintiff correctly explains, such a duty exists "when a person undertakes a certain course of conduct upon which a third party relies, and the person places the third person in a more vulnerable position than if they had done nothing." *Id.* at 22 (citing *Heard v. City of New York*, 623 N.E.2d 541, 544 (N.Y. 1993)). For example, if the owner of an office building undertakes to provide an attendant in the building lobby, and "if it was reasonably foreseeable that members of the public . . . would rely upon the continued presence of a building attendant in the lobby . . . and would tailor their own conduct accordingly," then the owner may be liable for negligently failing to provide an attendant on a particular occasion should that failure cause injury. *See Nallan v. Helmsley-Spear, Inc.*, 407 N.E.2d 451, 460 (N.Y. 1980). Such a duty arises, however, only "once a person undertakes a certain course of conduct upon

which another relies." *Heard*, 623 N.E.2d at 544.  That reliance, furthermore, must be reasonable. *Id.* at 544-45 (holding that no duty existed because "[s]imply stated, the [defendant's] actions created no justifiable reliance").  At that point, the defendant is under a duty to complete the course of conduct, and he may be liable if he does so negligently.  *Nallan*, 407 N.E.2d at 460 (requiring a plaintiff to show "that defendant . . . undertook to provide a service and did so negligently").

The Moving Defendants argue that the Amended Complaint does not establish the existence of such a duty.  The Court agrees.  On the one hand, a plaintiff might plausibly allege that a defendant had assumed a duty to protect her from sexual battery had she relied on its undertaking to do so.  But the Amended Complaint plainly does not allege that the Moving Defendants ever began that undertaking; indeed, if anything it alleges that they were indifferent about Plaintiff's sexual contact with Euringer even though their agents knew she was underage. Instead, then, Plaintiff argues that the Moving Defendants undertook to "support[]," "seek[] to profit from," "promot[e]," and "market[]" Euringer's music, with its pedophilic themes.  Pl. Opp. at 22.  Then, she argues that she relied on this undertaking in that she "was conditioned and influenced by Elektra's message, which hindered and prevented [her] from realizing, on her own, that the 'relationship' she was in was sexual abuse."  *Id.*  These facts, however, fail to establish the existence of a duty that the Moving Defendants are plausibly alleged to have breached through their negligence.

First, as mentioned, justifiable reliance on an undertaking, once commenced, creates the duty to complete *that undertaking* non-negligently.  In then-Judge Cardozo's words, "one who assumes to act . . . may thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v. Shepard*, 135 N.E. 275, 276 (N.Y. 1922).  The Moving Defendants certainly undertook to produce and sell Euringer's music, but even were reliance on that undertaking established, the

Amended Complaint does not plausibly allege that they negligently breached a duty to produce

and sell music, or that any breach of that duty caused harm to Plaintiff.  Second, Plaintiff's

allegations do not establish reliance.  A defendant assumes a duty by beginning an undertaking

only if others will rely on that undertaking, where reliance is understood as an adjustment to one's

own conduct based on the expectation that the undertaking will be completed non-negligently.  *See*

*Nallan*, 407 N.E.2d at 460 (imposing an assumed duty only if "members of the public . . . would

rely upon the continued presence of a building attendant in the lobby . . . and would tailor their

own conduct accordingly").[13]  But Plaintiff does not allege that she adjusted her own conduct in

any way based on the expectation that the Moving Defendants would non-negligently complete

their undertaking to make and sell Euringer's music.  Instead, she appeals to reliance in a different

sense:  she claims she relied on the truth of the positive depiction of pedophilia in the music that

the Moving Defendants made and sold, and that on that basis she concluded that her sexual contact

---

[13] Citing *Heard*, Plaintiff argues that "no special relationship is needed" in circumstances where "a person undertakes a certain course of conduct upon which a third party relies, and the person places the third person in a more vulnerable position than if they had done nothing."  Pl. Opp. at 21-22 (citing *Heard*, 623 N.E.2d at 544-45).  Plaintiff proceeds to argue that the Moving Defendants assumed a duty simply because their promotion and marketing of Euringer's pedophilic message left her worse off than she was before.  *Id.*  Plaintiff's briefing omits crucial context for this proposition.  *Heard* cited the Restatement (Second) of Torts, whose full sentence reads:  "Where, however, the actor's assistance has put the other in a worse position than he was in before, either because the actual danger of harm to the other has been increased by the partial performance, or because the other, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the actor is not free to discontinue his services where a reasonable man would not do so."  Restatement (Second) of Torts § 323 cmt. c.  Thus, the Restatement makes clear that the person injured must have been made worse off for one of two reasons, either of which involves her being worse off because of the expectation that the injurer's undertaking would be completed, once begun:  in the latter, other opportunities for assistance would not be foregone but for the belief that the undertaking would be completed, and in the former, a dangerous partial performance would not be accepted but for the expectation that it would be completed.  The Restatement's own example well illustrates the latter situation:  a driver who offers another a ride has a duty to complete the ride rather than stranding the passenger in dangerous circumstances, because the passenger would not have accepted the ride but for his expectation that, once undertaken, the ride would be completed.  *Id.*

with Euringer—which had commenced before Elektra signed Euringer—was not abusive.  Even setting aside the question of whether the imposition of liability for this essentially expressive conduct would be consistent with the robust protections for speech afforded by the United States and New York constitutions, this is not the sort of reliance required for a defendant to assume a duty under New York law.  Consequently, the Amended Complaint does not adequately plead a claim for negligence on the theory that the Moving Defendants assumed a duty by commencing an undertaking upon which Plaintiff relied.

### III.  Conclusion

For the foregoing reasons, the Moving Defendants' motion to dismiss is granted in full. The Clerk of Court is respectfully directed to close the motion pending at Docket Number 46. Plaintiff's request for leave to file a second amended complaint, Pl. Opp. at 25, is denied without prejudice.  Should she still wish to amend, by April 21, 2023 she shall file a pre-motion letter in conformity with Rule 6.A of the Court's Individual Rules and Practices in Civil Cases.  By that date, she shall also provide a status update as to the remaining Defendants, including whether they have been served with the Amended Complaint and, if not, whether she requests an extension of time to complete service.

SO ORDERED.

Dated: March 31, 2023
       New York, New York

_____
          JOHN P. CRONAN
       United States District Judge